IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SHERYL S.,[1]

    **Plaintiff,**

    v.

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

Civil Action 3:22-cv-172
Magistrate Judge Chelsey M. Vascura

## OPINION AND ORDER

Plaintiff, Sheryl S., ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB") and for Medicare Qualified Government Employee Benefits as a state employee. This matter is before the Court for consideration of Plaintiff's Statement of Errors (ECF No. 12); the Commissioner's Memorandum in Opposition (ECF No. 13); Plaintiff's Reply (ECF No. 14); and the administrative record as supplemented (ECF Nos. 9, 16). For the reasons that follow, the Commissioner's non-disability determination is **AFFIRMED,** and Plaintiff's Statement of Errors is **OVERRULED**.

    **I.**    **BACKGROUND**

Plaintiff protectively filed her Title application On December 2, 2018, alleging that she became disabled on September 20, 2016. Her application was denied at the initial and

---

[1] Pursuant to this Court's General Order 22-01, any opinion, order, judgment, or other disposition in Social Security cases shall refer to plaintiffs by their first names and last initials.

reconsideration levels, and a telephonic hearing was held on April 1, 2021, before an Administrative Law Judge ("the ALJ") who issued an unfavorable determination on June 9, 2021. That unfavorable determination became final when the Appeals Council denied Plaintiff's request for review on April 28, 2022.

Plaintiff seeks judicial review of that final determination. She submits that remand is warranted because the ALJ reversibly erred by failing to find that her headaches constituted a medically determinable impairment. (Pl.'s Statement of Errors 9–12, ECF No. 12.) Defendant correctly maintains that Plaintiff's contention of error lacks merit. (Def.'s Mem. in Opp'n, 6–14, ECF No. 14.)

## II.     THE ALJ'S DECISION

The ALJ issued his decision on May 21, 2021, finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 16–40.) The ALJ explained that for purposes of Plaintiff's DIB application, Plaintiff met the insured status requirements through December

31, 2020. (R. 22.) At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff not engaged in substantial gainful activity from her September 20, 2016 alleged onset date through her December 31, 2020 date last insured. (*Id*.) At step two, the ALJ found that Plaintiff had the following severe, medically determinable impairments: lumbar degenerative disc disease, peripheral neuropathy, malignant melanoma, plantar fasciitis, arrhythmia, status post labral repair, status post hernia repair, bilateral carpal tunnel syndrome, and depression. (*Id*.) At step three, the ALJ further found that Plaintiff did not have a severe impairment or combination of impairments that met or medically equaled a listed impairment. (*Id*.)

The ALJ then set forth Plaintiff's residual functional capacity ("RFC")[3] as follows:

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §§ 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

   1. Is the claimant engaged in substantial gainful activity?

   2. Does the claimant suffer from one or more severe impairments?

   3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

   4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

   5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §§ 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

[3] A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1).

> work as defined in 20 CFR 404.1567(a) except The claimant can frequently handle with both upper extremities, can never climb ladders, ropes, and scaffolds, occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, face no exposure to unprotected heights or having mechanical parts, and can never operate a motor vehicle. She is limited to simple routine and repetitive tasks that are not at production rate pace.

(R. 25.)

At step four, the ALJ determined that Plaintiff was unable to perform her past relevant work. (R. 30.) At step five, the ALJ explicitly relied on VE testimony to determine that in light of her age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Plaintiff could perform including the representative occupations of charge account clerk, table worker, and weight tester. (R. 30–31.) The ALJ therefore concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from September 20, 2016, through Plaintiff's date last insured. (R. 31.)

### III. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "take into account whatever in the record fairly detracts from [the] weight" of the

4

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## IV.    ANALYSIS

As previously explained, Plaintiff argues that the ALJ erred by failing to find that her headaches constituted a medically determinable impairment at step two. This contention lacks merit.

At step two, an ALJ must consider whether a claimant's alleged impairments constitute "medically determinable" impairments—*i.e.*, impairments that result from anatomical, physiological or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. §§ 404.1520; 404.1521. To be classified as "medically determinable," impairments must also meet the durational requirement in 20 C.F.R. § 404.1509, which provides that "[u]nless your impairment is expected to result in death, it must have lasted or be expected to last for a continuous period of at least 12 months." "Where the claimant is applying for DIB, 'the 12-month period may be any period of 12 months, so long as the period starts prior to the expiration of the claimant's insured status. The only requirement is

that the 12 months must be consecutive.'" *Bentschneider v. Comm'r of Soc. Sec.*, No. CV 16-12038, 2017 WL 1505120, at *5 (E.D. Mich. Apr. 7, 2017), *report and recommendation adopted*, No. 16-CV-12038, 2017 WL 1476900 (E.D. Mich. Apr. 25, 2017) (quoting Carolyn A. Kubitschek & Jon C. Dubin, *Social Security Disability Law & Procedure in Federal Court* § 2:6 (2017 ed.)); *see also Lyons v. Soc. Sec. Admin.*, No. 00-5361, 19 F. App'x 294, 300 (6th Cir. Sept. 13, 2001).

If an impairment is medically determinable, then an ALJ must determine whether it is severe. § 404.1521. A "severe impairment" is defined as "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If a claimant has at least one severe medically determinable impairment, an ALJ must consider the limiting effects of all a claimant's medically determinable impairments, severe and not, when assessing a claimant's RFC. 20 C.F.R. § 404.1523.

Plaintiff bears the burden of proving that an impairment is medically determinable at step two. The United States Court of Appeals for the Sixth Circuit has explained, however, that the step two inquiry is "employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (quoting *Farris v. Sec'y of Health & Hum. Servs.*, 773 F.2d 85, 90 n.1 (6th Cir. 1985)). Accordingly, a claimant's burden at step two is "a *de minimis* hurdle in the disability determination process" requiring a claimant to show only that an impairment has more than a minimal impact on his ability to perform work-related functions. *Id*. at 862. Still, an impairment must be medically determinable, severe, and of sufficient duration or there will be a finding of non-disability. 20 C.F.R. § 404.1520(a)(4)(ii).

Here, the ALJ determined that Plaintiff had the following medically determinable impairments that were severe: lumbar degenerative disc disease, peripheral neuropathy, malignant melanoma, plantar fasciitis, arrhythmia, status post labral repair, status post hernia repair, bilateral carpal tunnel syndrome, and depression. (R. 22.) The ALJ did not, however, find that Plaintiff's headaches were a medically determinable impairment. Plaintiff argues that this constitutes reversible error. Specifically, Plaintiff urges that by failing to find that her headaches were medically determinable, the ALJ failed to consider her headache-related limitations when the ALJ assessed her RFC. The Court is not persuaded.

First, the record shows that Plaintiff reportedly experienced headaches. Prior to the September 20, 2016 alleged onset date, Plaintiff reported headaches on at least five occasions. (R. 607, 293, 290, 1041.) She was diagnosed with migraines and prescribed headache relief medications. (R. 294.)

But Plaintiff also reported that she had no headaches or denied current complaints of headaches at least seven times before the alleged date of onset. (R. 1170, 1163, 1161, 295, 329, 1446.) And shortly after the September 20, 2016 alleged onset date, Plaintiff again indicated that she did not suffer from headaches at least two times. In particular, during an October 1, 2016 wound check, Plaintiff reported that she "had no other complaints." (R. 1432.) And on October 3, 2016, Plaintiff indicated that her symptoms did not include headaches. (R. 306.)

For the next five months, however, Plaintiff regularly reported headaches (R. 305, 303, 326, 1429, 300, 1034, 1586, 1153.) On November 2, 2016, Plaintiff indicated that she occasionally had migraines but no dizziness or vision problems. (R. 326.) Later that month, Plaintiff also indicated that she had started to experience a different kind of headache that she associated with the treatments she was receiving for melanoma. (R. 1427.) This new type of

headache, which felt like a heat in the center of her head, was also associated with photosensitivity. (*Id*.) It was also reportedly relieved with over-the-counter medications. (*Id*.) On December 1, 2016, Plaintiff reported that her headaches were worse, and that dizziness kept her mostly laying in bed. (R. 1426.) She was unsure if these were "chemo headaches" or if her migraines were worsening. (*Id*.)

During this period, a neurologist concluded that Plaintiff's headaches were unrelated to a pituitary lesion shown on an earlier MRI of her brain, but the neurologist referred Plaintiff to an endocrinologist for confirmation. (R. 1430.) A second MRI of Plaintiff's brain on December 2, 2016, showed a 2mm area of hypoenhancement within her pituitary gland. (R. 1484.)

On December 15, 2016, an oncologist opined that Plaintiff's new headaches could be variants of her previous migraines, hypophysitis related to her melanoma treatments, or evidence of brain metastasis from her melanoma. (R. 1588.) At that appointment, Plaintiff developed a severe headache that caused her to double over in pain. (R. 1586.) The oncologist instructed Plaintiff to seek treatment from an emergency department (R. 1588.) Although Plaintiff reported to an emergency department, she left before receiving treatment because of childcare issues. (R. 1588.) It does not appear that she returned to the emergency department for headache treatment that day.

On December 27, 2016, another provider discussed Plaintiff's MRI results. He indicated that lesions the size of Plaintiff's lesion were not, in his experience, "of any clinical consequence" and that 25 per cent of pituitaries that were "routinely dissected" had "lesions of this magnitude." (R. 1584.) Nevertheless, because of Plaintiff's cancer therapies, the provider thought it appropriate to monitor her for hypophysitis. (R. 1584.) The provider further opined

8

that he did not believe that Plaintiff's pituitary lesion had anything to do with her headaches, which were reportedly present for years. (R. 1585.)

Plaintiff denied current complaints of headaches on January 11, 2017. (R. 1424.) At a January 23, 2017 appointment with an endocrinologist, however, Plaintiff indicated that she had experienced headaches that were worse during the last weeks of November 2016, but that her severe and intense headaches had resolved and that she currently had headaches only on and off. (R. 1579.) The endocrinologist wrote that Plaintiff's worsening headaches after she started cancer therapy raised the possibility of hypophysitis, but it was unlikely given Plaintiff's negative MRI and the fact that her headaches had improved. (R. 1582.) The endocrinologist also wrote that Plaintiff's pituitary adenoma was not causing pressure symptoms, and that if another MRI could rule out metastasis, Plaintiff's adenoma could be monitored by MRI every one to two years. (R. 1582)

During a January 26, 2017 neurology appointment, Plaintiff reported that she had experienced headaches since age fourteen; that she had them four to five times a year until she reached age 30; and that she had them several times a week after reaching age 38. (R. 1414.) Those headaches were triggered by movement but improved when she distracted herself. (*Id*.) Plaintiff also reported again that she had begun experiencing a different kind of headache after starting melanoma treatments and that those headaches worsened with movement and caused her to lay down. (*Id*.) Plaintiff stated that she had been taking metoprolol and Topomax since May 2015, those medications were not providing headache relief, and that she was taking Motrin and Roxicodone for chronic SI pain. (*Id*.) The neurologist administered an occipital nerve block that day and advised Plaintiff to discontinue use of metoprolol and Motrin, and to decrease her use of opioids for chronic pain as they were maybe contributing to her headaches. (R. 1418.) Plaintiff

9

was started on Venlafaxine and prescribed rizatriptan to be used as needed for severe headaches. (*Id.*) Plaintiff was also advised to seek cognitive behavioral therapy. (*Id.*)

During the next eight months, Plaintiff did not report headaches when she sought treatments and instead regularly indicated that she had no neurological symptoms (R. 414, 411, 409, 406, 403, 400, 457, 397), or denied that she had current complaints regarding headaches (R. 1413). Indeed, Plaintiff did not report headaches again until October 18, 2017, at which time she presented with headaches that were triggered by weather changes and chemotherapy, but no nausea, vomiting, photophobia, or phonophobia. (R. 370.)  Plaintiff reported that Advil did not provide relief, and she was continued on metoprolol. (R. 370–371.) For the four-month period after that, however, Plaintiff indicated that she had no neurological symptoms or denied current complaints regarding headaches. (R. 394, 391, 445, 1408.) On February 6, 2018, Plaintiff also indicated that the injections she had previously received had controlled her migraines. (R. 341.)

From March through early May 2018, Plaintiff again reported headaches (R. 856, 1403, 853, 1394), without nausea, vomiting, photophobia, or phonophobia (R. 855), or focal neurological symptoms or tremors (R. 856, 853). During that three-month period, Plaintiff also reported that her headaches were controlled with medication (R. 1394), and that she was doing very well and had experienced only one headache a month after receiving her occipital nerve block until December 2017, when she began to experience them more frequently (R. 1403). Plaintiff additionally indicated that rizatriptan worked very well for her but that she had not started her other medication, Venlafaxine. (R. 1403.) Plaintiff received another occipital nerve block during this period. (R. 1405.) After that nerve block, Plaintiff told a provider that she had received an injection and was doing very well. (R. 1394.)

Plaintiff denied current complaints of headaches at appointments in late May and June 2018. (R. 1392, 1972, 1390, 1387.) But from July through early September 2018, Plaintiff indicated that she had headaches (R. 851, 909, 849) with no focal symptoms or tremors (R. 851, 849). She further reported that her pain was partly controlled with medications. (R. 909.) From late September through late November 2018, however, Plaintiff indicated that she had no neurological symptoms or denied headaches. (R. 769, 3169, 765.)

On November 26, 2018, Plaintiff indicated that her headaches were present but that they had improved, she was taking Maxalt as needed, and that gabapentin and metoprolol had helped. (R. 1374.) Likewise, Plaintiff indicated that her headaches were present on December 18, 2018. (R. 845.) But on February 11 and 25, 2019, Plaintiff denied that she had current complaints of headaches and reported that she had no neurological symptoms. (R. 1372, 762.) On February 28, 2019, Plaintiff reported that she had headaches that started years earlier, but that she was compliant with her treatments, she had good symptom control, and "good tolerance" for her treatments. (R. 843.)

During the eight-month period from March 2019 until December 2019, Plaintiff reported headaches only two times. (R. 1824, 2233). During this same period, she regularly indicated that she was negative for headaches, that headaches were not present, or that she had no current headache complaints. (R. 1665, 1674, 1789, 1890, 2353, 2338, 2331.)

From late December 2019 through mid-February 2020, Plaintiff reported headaches (R. 2393, 2391, 2295, 2389) without focal neurological symptoms or tremors (R. 2393, 2391, 2389). During this period, Plaintiff also told a provider that her migraines were under fairly good control even though she had occurrences of mild headaches. (R. 2294.) An MRI during this period showed that Plaintiff's pituitary lesion was unchanged. (R. 2279.)

During the eight-month period from April 2020, through the December 31, 2020 date last insured, Plaintiff routinely indicated that she had no headaches, denied migraines, or indicated that she had experienced no unusual headaches for the last fourteen days. (R. 2420, 2418, 2387, 2324, 2992, 2316, 2981, 2976, 2973.) In fact, Plaintiff reported headaches only once during this eight-month period. (R. 2383.) At the time of that report, however, Plaintiff again indicated that she was compliant with her medications and that she had good symptom control and tolerance for her treatments. (R. 2384.) At appointments after her date last insured, Plaintiff also continued to indicate that she had no unusual headaches in the last fourteen days. (R. 2969, 2966, 2957.)

In short, it is not entirely clear, on this record, that Plaintiff's headaches lasted for 12 consecutive months given that she regularly denied headaches for months at a time. But even if Plaintiff's headaches did satisfy the duration requirement, the Court further finds that any error was harmless. In *Fresquez v. Commissioner of Social Security*, an ALJ failed to discuss the Plaintiff's chronic fatigue syndrome ("CFS") and classify it as a medically determinable impairment at step two.  No. 1:18cv114, 2019 WL 1440344, at * 1 (S.D. Ohio March 31, 2019). This Court nevertheless concluded that the ALJ's failure to do so was harmless because the ALJ "continued the sequential analysis through the determination of [the plaintiff's RFC] and the Plaintiff failed to both identify any functional limitations attributable to her CFS that the ALJ failed to consider and to challenge the ALJ's adverse credibility determination."  (*Id*.) (internal quotation omitted). Such is the case here. The ALJ determined that Plaintiff had at least one medically determinable impairment that was severe and continued the sequential evaluation. But Plaintiff does not point to, and it is not apparent from the record, that there are any functional limitations attributable to her headaches that the ALJ failed to consider. *See id*.; *see also Rouse v. Comm'r of Soc. Sec*., No. 2:16–cv–223, 2017 WL 1102684, at *2-3 (S.D. Ohio Mar. 24, 2017)

("Despite it being 'better practice [for an] ALJ to say explicitly which impairments are found to be non-severe and which are found to not be medically determinable' . . . [the claimant] has failed to identify which impairments at issue have affected her functioning or limited her ability to work, nor is it apparent from the record.").

Specifically, Plaintiff asserts that because of her migraines, she requires an off-task or an absence limitation. (Pl.'s Statement of Errors 11, ECF No. 12.) As part of the subjective symptom assessment, however, the ALJ explicitly discussed such a limitation as follows:

> The suggestion that the claimant must lie down several times per day is not supported by sufficient objective or opinion evidence. This appears to be a personal lifestyle choice that is not necessitated by longitudinal symptoms or documented medication side effects found in the record. Despite the claimant's extensive course of care and a need to see myriad clinicians, there are no treating source opinion statements in the file that conflict with the state agency findings or the residual functional capacity reached in this decision. Finally, in choosing not to offer any detailed written accounts such as Function Reports or Questionnaires, the claimant lost the opportunity to provide additionally convincing detail and function-by-function specifics regarding the allegedly disabling symptoms and limitations. While no one factor cited above is dispositive, and each perhaps on its own does not establish anything conclusively, the totality of the facts and circumstances cited above made it difficult for me to rely heavily on the claimant's subjective complaints. Consequently, I have relied greatly on the available objective medical evidence of record and the persuasive medical opinion statements.

(R. 26.)

As this discussion demonstrates, the ALJ considered several factors when determining that Plaintiff's alleged need for such a limitation was not wholly supported by the record. First, the ALJ explained that Plaintiff's alleged need to lie down was not supported by sufficient objective evidence, noting that it appeared to be a "personal lifestyle choice that was not necessitated by longitudinal symptoms . . . ." (*Id.*) Substantial evidence supports that explanation. The record lacks longitudinal evidence of Plaintiff's alleged need to lie down—it appears that Plaintiff only twice reported to providers that she needed to lie down because of her

headaches. (R. 1414.) In one of those reports, made in January 2017, Plaintiff explained that she needed to lie down due to a different type of headache that she began experiencing after starting melanoma treatments in November 2016. (*Id.*) Notably, it appears that Plaintiff also reported that those severe and intense headaches associated with her melanoma therapy in November 2016 were resolved by January 2017. (R. 1579.) In addition, at the hearing, Plaintiff testified that she spent time in her recliner to take pressure off her *hip*, and if that worked, she would end up in bed. (R. 55.) But at no time did she testify that her *headaches* caused her to need to lie down.

The ALJ also explained that Plaintiff's alleged need to lie down was not supported by sufficient objective evidence because it "was not necessitated by . . . documented side effects . . . ." (R. 26.) Substantial evidence supports that explanation as well. On at least two occasions, Plaintiff indicated that she was compliant with her headache treatments, they provided good symptom control, and she had "good tolerance" for them. (R. 843, 2383.)

The ALJ additionally explained that Plaintiff's alleged need to lie down was not supported by sufficient opinion evidence. (R. 26.) The ALJ noted that despite extensive treatment records, none of Plaintiff's treatment providers ever opined such a limitation. (*Id.*) Substantial evidence supports that consideration too—that limitation is nowhere opined in the record. Plaintiff nevertheless argues that the ALJ erred by considering the lack of an opined limit because the pertinent regulations do not require limits to be supported by opinions. (Pl.'s Reply 3, ECF No. 14.) But as discussed herein, the ALJ considered several factors and explained that even if none were singularly dispositive, in totality, they detracted from Plaintiff's allegations. (R. 26.) Plaintiff appears to have overlooked the other record-based factors that the ALJ considered.

Plaintiff also argues that that ALJ erred by failing to consider her migraines at all. (Pl.'s

14

Statement of Errors 10, ECF No. 12.) An ALJ is not required, however, to "discuss every piece of evidence in the record to substantiate the ALJ's decision." *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004)); *see also Dykes ex rel. Brymer v. Barnhart*, 112 F. App'x 463, 467–68 (6th Cir. 2004) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." (citations omitted)). In any event, and as Plaintiff acknowledges, when assessing Plaintiff's RFC, the ALJ twice discussed headache-related information found in different treatment records. (*Id*. at 9.) The ALJ expressly noted that Plaintiff alleged a headache in October 2017, but that objective examination findings were normal that day, and that an EEG of Plaintiff's brain done to determine the etiology of her headaches in May 2018 was normal. (R. 27.) Although brief, these headache-related references undercut Plaintiff's argument and instead demonstrate that the ALJ considered Plaintiff's headaches.

      Plaintiff also appears to assert that her other migraine symptoms—photophobia, nausea, vomiting, and dizziness—necessitated a light exposure limit, and that the ALJ erred by failing to incorporate one into her RFC. (Pl.'s Statement of Errors 11, ECF No. 12.) But the record contains no opined light exposure limitations. Moreover, the treatment records show that although Plaintiff sometimes reported that her migraines presented with these additional symptoms, Plaintiff regularly indicated that no such symptoms were present. On November 2, 2016, Plaintiff endorsed headaches but denied dizziness and visions problems. (R. 326.) On March 9, 2018, Plaintiff endorsed headaches but denied that she experienced nausea, vomiting, photophobia, or phonophobia. (R. 855.) At appointments in August and September 2018,

Plaintiff's headaches were not accompanied by focal neurological symptoms or tremors. (R. 851, 849.) Likewise, Plaintiff reported that she had no focal neurological symptoms or tremors when she reported headaches from late December through mid-February 2020. (R. 2392, 2391, 2389.) Moreover, at the hearing, Plaintiff testified that she had two or three migraines a month. (R. 61.) But when asked why she would not be able to do "sit-down work," Plaintiff testified that she had issues with her hands. (R. 70.) She did not, however, indicate that she had issues with light, nausea, or dizziness. In sum, the Court cannot conclude, on this record, that the ALJ erred by failing to consider or incorporate into Plaintiff's RFC light exposure limits.

Moreover, Plaintiff has not challenged the ALJ's adverse credibility determination (a.k.a. subjective symptom analysis). 2019 WL 1440344, at *1. For all these reasons, the Court finds that the ALJ did not commit reversible error and that Plaintiff's contention of error lacks merit.

V. CONCLUSION

For all the foregoing reasons, the Court **AFFIRMS** the Commissioner's non-disability determination and **OVERRULES** Plaintiff's Statement of Errors.

**IT IS SO ORDERED.**

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE